# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| JOANN ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 03 C 7589 |
| v. | ) | |
| | ) | Maria Valdez, |
| NATIONAL RAILROAD PASSENGER | ) | Magistrate Judge |
| CORPORATION a/k/a AMTRAK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant National Railroad Passenger Corporation a/k/a Amtrak's ("Amtrak") Motion for Summary Judgment [doc. no. 78]. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claims asserted in the amended complaint present federal questions. On January 16, 2004 the parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Through a four-count amended complaint, Plaintiffs sued Amtrak for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*, for retaliation under Title VII, a claim under 42 U.S.C. § 1981 for violation of Plaintiffs' right to make and enforce their employment contract, and claim for breach of contract. On June 9, 2004, Magistrate Judge Denlow dismissed Plaintiff's breach of contract count. Thereafter, on January 13, 2006, Amtrak moved for summary judgment on all remaining counts.

## Background

Plaintiffs are African American, White, and Latino former employees of Amtrak's Chicago reservations call center.[1] In 2003 Amtrak decided to close down the entire Chicago call center and re-route the reservation calls to the remaining two call centers located elsewhere in the country. The other two call centers were located in Philadelphia, Pennsylvania and Riverside, California. Philadelphia's call center had a workforce of 35.29% African American and 60.61% White. Riverside's call center had a workforce of 28.36% African American and 50.43% White. At the time of the announcement of the closure in January 2003, the racial background of the Chicago call center's workforce was 54.15% African American and 35.55% White.[2] Overall, 267 employees in Chicago were affected by the closure.

This was not the first time that Amtrak had considered closing the Chicago call center, the issue was raised in 1996 when Amtrak was notified that it could not renew the lease on the Chicago call center space. (Def.'s L.R. 56.1(a) Stmt. ¶ 16). Instead of closing down the call center, in 1997 Amtrak and the union engaged in negotiations concerning cost reductions. (*Id.* ¶ 17). As a result, the Chicago call center was not closed, but a new lease was negotiated. (*Id.* ¶ 18). This cost savings measure appeared to have a short-term effect because all was not well at Amtrak. In 2001, Amtrak's Reservation Sales Department restructuring plan called for costs cuts of at least 7.1 million dollars

---

[1] The facts relied upon are undisputed or have been deemed admitted pursuant to Local Rule 56.1. Because a party opposing a motion for summary judgment is required to serve and file any opposing affidavits and other materials referred to in Rule 56(e), a supporting memorandum of law and a concise response to the movant's statement. *See* N.D. ILL. R. 56.1(b), the opposing party's failure to adequately controvert the moving party's statement of facts results in the moving party's version of the facts being deemed admitted. *See* N.D. ILL. R. 56.1(b)(3)(B). The Seventh Circuit has repeatedly upheld strict enforcement of Local Rule 56.1. *See, e.g., Cichon v. Exelon Generation Co. LLC.*, 401 F.3d 803, 809 (7th Cir.2005).

[2] The call center closed in December 2003 approximately one year after notification of closure.

from fiscal year 2001, included it the plan was a reduction in the Chicago call center's hours and days of operations and a modest downsizing of staff. (*Id.* ¶ 19.)

In October of 2001, Amtrak and the union signed a memorandum of understanding ("MOU") prohibiting Amtrak from closing down any of the call centers before December 31, 2003 except the Chicago call center. (Pls.' L.R. 56.1(b)(3)(B) Stmt. ¶ 15.) Specifically with respect to the Chicago call center, the MOU permitted Amtrak to close this center before December 31, 2003 upon a 30 day written notice if the volume decreased by 20% from the prior fiscal year and amounted to less than 18.8 million dollars. (*Id.*) The MOU allowed Amtrak to close down any call center after December 31, 2003 upon a six-month written notification. (*Id.*)

In fiscal year 2002 (October 2001 through September 2002) overall call volume to Amtrak reservation agents was down 20% and by November 2002, it was down 36%. (Def. L.R. 56.1(a) Stmt. ¶ 23.) Due to the decrease in telephone reservations, Amtrak reduced the national call center workforce by 122 positions in July 2002. (*Id.* ¶ 25.) Amtrak analyses projected that in fiscal year 2003 there would be 21% more call center capacity than needed for peak periods. (*Id.* ¶ 27.)

Sometime before February 2002, Amtrak hired McKinsey & Co. ("McKinsey"), an independent consultant firm that was charged with studying the call center system. (Pls.' L.R. 56.1(b)(3)(B) Stmt. ¶ 17.) McKinsey issued a report to Amtrak dated February 21, 2001 entitled "Improving the Operational Effectiveness of Call Centers" (the "McKinsey Report"). (*Id.* ¶ 4, Ex. C ¶ 2(c).) The McKinsey Report found that all three centers were operating well on three sectors; attrition, cost, occupancy and employee morale. (*Id.* at Ex. C ¶ 2(d).) Contained in the McKinsey

Report is a discussion on possible scenarios, and twice contained the phrase: "Attrition until January 2004 Chicago closure (status quo)." (*Id.* Ex. C ¶ at 2(b), (c), (e).)[3]

Matt Hardison was Amtrak's Chief of Sales Distribution and Customer Service Department beginning in April 2002. (Def.'s L.R. 56.1(a) Stmt. ¶ 22.) The call centers were under his department. (*Id.* ¶ 21.) As of late summer or early fall of 2002, a four-person team was in existence the purpose of which was to explore options for dealing with the excess capacity at the Amtrak call centers. (*Id.* ¶¶ 28-29.) The team comprised of Jay Lawrence, Senior Director for the Call Centers; Robin McDonough, Senior Director of Finance and Planning; Ed Madden, Manager of Manpower Planning for Call Centers; and Luc Foisey, and outside consultant. (*Id.* ¶ 29.) The team did not consider racial demographics or numbers of discrimination complaints of the three call centers when undertaking their work. (*Id.* ¶ 31.)[4] One member of the team, Jay Lawrence, was aware that

---

[3]   Amtrak objects to the this fact on hearsay grounds and as hearsay upon hearsay. (Def.'s Reply at 7.) The information from the McKinsey report comes by way of a stipulation entered into by the parties. The stipulation includes the following language: "[t]he parties stipulate that the following facts about the McKinsey Report are true: . . . (e) In discussing possible scenarios, The McKinsey Report twice contains the phrase :'Attrition until January 2004 Chicago closure (status quo).'" The stipulation does not preserve, nor does it waive any possible evidentiary objections. However, the stipulation indicates that the parties are agreeing that the facts are true, thus it could be considered as an admission, one that lulled the Plaintiffs into not pursuing any further discovery on the matter. *See Keller v. United States*, 58 F.3d 1194, 1198-99 n.8 (7th Cir. 1995) (stating that judicial admissions includes "stipulations" by a party or its counsel, that are binding upon the party making them" as a result they "have the effect of withdrawing a fact from contention"). For purposes of ruling on this motion, the Court will view the stipulation as an admission that the statements are contained in the McKinsey Report and are factually true, but the stipulation is not an admission as to how the statements are to be interpreted.

[4]   Amtrak provides in their 56.1 statement the following: "The team did not compare or consider racial demographics or numbers of discrimination complaints of the three Call Centers when evaluating possible scenarios." (Def.'s L.R. 56.1(a) Stmt. ¶ 31.) Plaintiffs responded as follows: "Deny. The team was not evaluating 'possible scenarios,' it was creating an ostensible justification for the closure of Chicago, which had been decided on the previous year." (Pls.' L.R. 56.1(b)(3)(A) Stmt. ¶ 31.) The denial fails to address the statement that the decision makers did not consider racial matters or discrimination complaints and is only supported by reference to the lack of justification for the decision. Because the factual statement is inadequately denied it will be deemed admitted. *See* N.D. ILL. R. 56.1(b)(3)(B) (opposing party's failure to adequately controvert the moving party's statement of facts results in the moving party's version of the facts being deemed admitted); *McGuire v. United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission.").

allegations of discrimination had been made since he had been interviewed by Amtrak's Dispute Resolution Office. (Pls.' L.R. 56.1(b)(3)(B) Stmt. ¶ 19.)

**Jay Lawrence's Alleged Racial Attitude**

Between February 1999 and April 2002, one of the plaintiffs, JoAnn Anderson, in her capacity as a manager of the Chicago call center, made six separate written complaints to Amtrak about Lawrence's treatment of African Americans. (*Id.* ¶ 13.) The details of these allegations are not completely known as the record does not set forth the specifics of all the allegations. In April 2002, she submitted a complaint of discrimination not on her own behalf but on behalf of others for Amtrak's internal review process. (*Id.* ¶ 18.) In support of Lawrence's alleged racial animus the plaintiffs rely upon the following matters:

> a) on an unknown date Lawrence questioned the ability of a Mr. Johnson (plaintiffs do not provide a racial identification)[5] to perform his job. Amtrak found that Lawrence was not very credible in his denial of the comment and further determined that Lawrence was uncomfortable around Johnson, although Amtrak could not establish the motivation for Lawrence's remark;[6]

---

[5] There is a Mr. Johnson listed as one of the plaintiffs in this case, but it is unclear based on this record whether plaintiffs are referring to plaintiff Johnson or another Mr. Johnson. *See Albrechtsen v. Bd. of Regents of Univ. of Wisc. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) (court need not scour the record to establish positions for a party).

[6] Plaintiffs misrepresent the record on this issue. Plaintiffs assert that "Amtrak's [I]nternal Dispute Resolution Office found that Jay Lawrence had falsely denied making a comment about an African-American employee in the Chicago call center and that he had 'some discomfort' with the African-American employee. . . . The DRO also 'did not find Mr. Lawrence to be very credible in his denial.'" (Pls.' L.R. 56.1(b)(3)(B) Stmt. ¶ 14). Plaintiffs factual assertion distorts the findings of Amtrak's internal review. The actual report states that Lawrence was "not very credible" in his denial that he had questioned Johnson's ability to lead, and it states that the reviewer found that Lawrence's motivation for making the remark was not clear although they did find that Lawrence did feel uncomfortable around Johnson. (Pls.' L.R. 56.1(b)(3)(B) Stmt. Ex. E2 at 3.) (emphasis added).

5

b) at some unknown date, plaintiff Lara heard Lawrence comment that the employees of the Chicago call center could not adequately "read and write." (*Id.* ¶ 11.);

c) plaintiff Russell provided testimony of his subjective belief that he felt that Lawrence was uncomfortable around African Americans because Russell believed that Lawrence felt bothered by questions from African American employees. (*Id.*) In particular, Russell perceived that Lawrence appeared uncomfortable around a quadriplegic African American employee who needed assistance holding a spoon and also commented. No date is given for this event. Russell also testified that Lawrence commented to him at a meeting (no date is indicated) that an African American woman was "a handful and a load." Plaintiff Russell also believed that Lawrence displayed a rude attitude to African American politicians based on one dinner event in the late 1990's in which Russell observed that Lawrence failed to acknowledge or thank then-Senator Moseley-Braun or Congressman Bobby Rush, both of whom Russell states were instrumental in procuring funding for Amtrak. (*Id.*); and

d) Lawrence remarked at an office function in 1998 that the Chicago call center would be closed in five years. (*Id.* ¶ 12.)[7]

## The Decision to Close the Chicago Call Center

On April 3, 2002, Amtrak's Executive Vice-President Richardson asserted that there was no plan or development of any plan to close the Chicago call center. (*Id.* ¶ 21.) On June 19, 2002, Matt Hardison wrote to Amtrak's CEO David Gunn and to Richardson that there was currently no plan to close the Chicago call center. (*Id.* ¶ 24.) Plaintiffs believe that these statements were false assurances.[8]

---

[7] In support of this fact, the plaintiffs cite to the account of plaintiff Anderson and plaintiff Lara. Amtrak objects to this as inadmissible hearsay. The record does support plaintiff Anderson's testimony on this issue. In Anderson's deposition testimony she relates the circumstances and substance of the remark and in her affidavit, which is based on personal knowledge, the same information is related. While neither her affidavit or deposition testimony set out the basis for her knowledge, neither do they indicate her lack of knowledge. The same is not true for plaintiff Lara's testimony. Based on plaintiff Lara's deposition testimony it appears that he also did not personally hear the purported statement. (Def.'s L.R. 56.1(a) Stmt. Supp. E. 5 at 35-36.) As such, the Court will not rely on Lara's testimony.

[8] Plaintiffs' rely on the Anderson affidavit for evidence that the Hardison or Richardson lied to other decision-makers about the alleged long-standing intent to close down the Chicago call center. This

Hardison and Richardson reviewed the final business case analysis with Amtrak CEO Gunn, who agreed with the recommendation to close the Chicago call center. (Def.'s L.R. 56.1(a) Stmt. ¶ 36.) The Amtrak Board of Directors voiced no objection to this recommendation when they met on December 12, 2002. (*Id.* ¶ 37.) Plaintiff admits that neither CEO Gunn, nor the Amtrak Board were provided with any racial demographic information on any of the call centers nor was she given any information about the numbers of discrimination complaints. (*Id.* ¶ 38.) Plaintiff also admits that Richardson was not provided with any racial demographic information on any of the call centers nor was she given any information about the numbers of discrimination complaints, see *id.* ¶ 35, and Hardison was not aware of, and did not take into account, the racial demographics of the call center or the discrimination complaints. (*Id.* ¶ 33).[9]

Hardison testified that he made his recommendation to close the Chicago call center based on a number of factors: (a) closing the Riverside call center would leave Amtrak with a shortage of workers given the size of the office and would require hiring and training new employees to fill the gap; (b) the Philadelphia center had the highest call volume; (c) Philadelphia and Riverside could cover the widest range of time zones being on the east coast and west coast, respectively; (d) the Philadelphia center was nearest to Amtrak's headquarters and was in a new building that had 15 years to run on its lease with no option for early termination; (e) the Chicago call center was approximately the same size as the excess capacity; and (f) closing Chicago would result in a short term 1 million

---

Anderson affidavit on this point is mere speculation and unsupported by her affidavit. *See Adusumilli v. City of Chi.*, 164 F.3d 353, 359-60 (7th Cir.1998) (affirming striking, as speculation, portion of employee's affidavit attesting to supervisors' alleged knowledge because it was not reasonable to impute knowledge to them).

[9] Again, Plaintiffs fail to deny this fact with appropriate citation to the record.

dollar cost, but with a long term 1.5 million and 3.0 million dollar saving in fiscal year 2004 and 2005. (*Id.* ¶ 32; Hardison Aff. ¶ 15.) The Plaintiffs believe that all of these reasons are *post hoc* rationalizations and are illogical.

After announcement of the closure, the Chicago call center employees were given the opportunity to transfer to one of Amtrak's two other call centers with a $7,500 stipend to assist with relocation, the amount of which was subject to tax withholding. (Def.'s L.R. 56.1(a) Stmt. ¶ 44.) The Chicago call center union employees were also given the opportunity to bid on 300 already occupied positions at Amtrak (a "Sadie Hawkins" process), with the jobs being awarded based on union seniority. (*Id.* ¶ 46.) The result of this process was that Chicago call center employees who successfully bid on jobs at Amtrak in Chicago displaced other employees with less seniority. (*Id.* ¶ 48.) A majority of the Chicago call center employees were awarded jobs under this process. (*Id.* ¶ 51.)

### Summary Judgment Standard

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party is responsible for demonstrating to the Court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-27 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

A disputed fact is material if the fact might affect the outcome of the case. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict." *Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 379 (7th Cir. 2000) (quoting *Anderson*, 477 U.S. at 255). If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the non-moving party bears the responsibility of identifying the evidence upon which they rely. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

The Seventh Circuit has stated "that courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). Even when discriminatory intent is at issue, summary judgment is appropriate when the non-movant presents no reliable evidence to indicate motive or intent in support of their position. *See Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989). Further, the non-movant will not defeat summary judgment merely by pointing to self-serving allegations without evidentiary support. *See Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994).

## Discussion

Plaintiffs bring their discrimination claims under both Title VII and Section 1981. The same legal analysis applies equally to both claims. *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002). Plaintiffs' claims of race discrimination or retaliation can survive summary judgment if they provide sufficient evidence to demonstrate their legal claims. To put it bluntly, summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation and citation omitted).

Here, Plaintiffs do not expressly state in their memorandum opposing summary judgment what legal theories they are relying upon to support their claims. They begin their legal argument by asserting that "juries in employment-discrimination cases are not instructed to follow McDonnell-Douglas; rather, they are asked to determine 'whether defendant would have discriminated against the plaintiffs had they not been in a protected class and everything else had been the same.'" (Pls.' L.R. 56.1(b)(2) Mem. at 8.) They then proceed to spend over six pages detailing what they believe are reasonable factual inferences that a jury could find in support of their claims. What they fail to do is cite to any appropriate legal theory by which this Court can evaluate their claims.

The only framework offered by Plaintiffs is their reliance on a jury instruction. However, they apply the wrong standard. The Supreme Court has held that at the pretrial stage a judge must look at whether the plaintiffs have made their prima facie case and can survive the burden-shifting that occurs. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994). This same analysis does not apply to the trial stage because at the trial stage the only question the jury will need answer is whether the plaintiff is a victim

10

of intentional discrimination. *Id.* Relying on a jury instruction at this stage is putting the cart before the horse.

The lack of an articulated framework by Plaintiffs makes the task of reviewing this summary judgment motion difficult. "This Court has no duty to research and construct legal arguments available to a party, especially when [they] are represented by counsel." *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995) (internal quotations omitted). Since Plaintiffs have offered no applicable standard by which to measure their claims, the Court will proceed with a disparate treatment analysis under both a direct and indirect theory to determine if they have enough in their cart to advance to trial.

## I.    Plaintiffs' Discrimination Claims.

### A.    Direct Evidence Method.

Direct evidence of discrimination is "evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (internal quotations omitted). "Direct evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Id.* at 753 (citation omitted). Such admissions rarely occur. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir.2000). In addition, the direct evidence must relate to the specific employment decision and show that the decision was undertaken for a reason prohibited by Title VII. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005).

11

Plaintiffs do not point to any direct evidence of racial animus -- there are no smoking guns here. Plaintiffs do appear to be offering an argument based on a circumstantial evidence theory, which may also defeat summary judgment under the direct method of proof if Plaintiffs can construct a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision-maker." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir.2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir.1994)); *see also Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). Circumstantial evidence may come in the form of "suspicious timing, ambiguous statements oral or written, [or] behavior toward or comments directed at other employees in the protected group . . . ." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272-73 (7th Cir.2004) (quoting *Troupe*, 20 F.3d at 736). Nevertheless, even circumstantial evidence must point directly to a discriminatory reason for the employer's action. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). The key question in this case is whether Plaintiffs can construct a convincing mosaic based on reliable evidence establishing that Amtrak was motivated by racial animus when it decided to close down the Chicago call center.

### 1. *Statistical Evidence.*

Plaintiffs rely upon the statistical evidence of the Amtrak's call center demography as a foundation for the construction of their mosaic. Specifically, Plaintiffs argue that the Chicago call center "is the least white & [sic] most African-American of Amtrak's Call Centers." (Pls.' L.R. 56.1(b)(2) Mem. at 1.) While it is true that the Chicago call center was proportionally more African

American than the other two centers, it is equally undisputed that the each of other two centers employed a numerically larger number of African American employees than did Chicago.[10]

Statistics alone are not sufficient to establish disparate treatment. The Seventh Circuit has "rejected efforts to use statistics as the primary means of establishing discrimination in disparate treatment situations." *Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 552 (7th Cir. 2000). Even accepting Plaintiffs' statistical evidence, this Court would find that it fails to demonstrate that racial prejudice mandated the result in this case. Plaintiffs' comparison of racial statistics among the three call centers is an insufficient analysis to provide support for Plaintiffs' claims. *See King v. Gen. Elec., Co.*, 960 F.2d 617, 627 (7th Cir.1992) (noting that straight percentage comparisons as not statistically significant). The basic problem with relying on statistics is that statistics can only show a relationship between the employer's decision and the racial traits of the employees, they do not show causation. *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir.1988).

Even accepting the statistical evidence, Plaintiffs still have an uphill battle in reaching their result. Closing down the Chicago call center not only impacted the 50% African American workforce, but equally impacted the 50% non-African American workforce, of which Whites comprised 35.55%. If Amtrak's decision to close the Chicago call center was motivated by racial animus against African Americans, they were willing to act on this animus at the expense of many other workers who were not African American. Although Plaintiffs may argue that Amtrak is an irrational discriminator, their theory is unreasonable. *See Davis*, 368 F.3d at 783 ("[W]e think it ridiculous to suggest that Con-Way would terminate nine other employees from Davis's facility, not

___

[10] Plaintiffs do not dispute that the African American workforce in Chicago numbered 163; Riverside employed 230 African Americans and 409 White employees while Philadelphia employed 198 African Americans and 340 Whites. (Def.'s L.R. 56.1(a) Stmt. ¶ 15.)

to mention forty others from around the State of Indiana, on the pretense of economic hardship, just so it could cover its tracks with Davis.").

### 2. *Lawrence's Racial Attitude.*

In addition to the statistical evidence, Plaintiffs depend heavily on alleged comments made by Jay Lawrence that, they assert, demonstrates a "racial attitude" against African Americans. Lawrence was one of a four-person team who had input into the decision to close the Chicago call center. Although Lawrence was not a final decision maker (that was left to the Amtrak Board of Directors), "if the person who made the derogatory remarks provided input into the employment decision – and the remarks were made around the time of and in reference to that decision – 'it may be possible to infer that the decision makers were influenced by those [discriminatory] feelings.'" *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) (citing *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000)).

Plaintiffs add to their mosaic by pointing to the evidence surrounding Lawrence's alleged long-standing attitude against African Americans. Unfortunately for Plaintiffs, there are numerous problems with relying on the Lawrence statements. First, from an evidentiary standpoint, there is very little value in any of the statements. The statements or observations are either undated or occurred in 1998, some five years before the decision to close the Chicago center was made. Some of the statements and/or conduct attributed to Lawrence fail to even identify whether the subject of the comment was African American. Second, Russell's personal feelings on how he perceived Lawrence to be uncomfortable around a disabled African American worker and unfriendly to African American politicians is just that, his subjective belief. Russell's subjective beliefs are insufficient to create an inference of discrimination." *McMillian v. Svetanoff*, 878 F.2d 186, 190, (7th Cir.1989), *cert. denied,*

14

488 U.S. 855 (1988) ("[S]ubjective beliefs of the plaintiff, however, are insufficient to create a genuine issue of material fact."); *accord Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 401 (7th Cir. 1997) ("[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.").

What Plaintiffs are left with is an undated comment that Lawrence remarked that an African American employee was "a handful and a load"; an undated comment attributed to Lawrence accusing the employees of the Chicago center for not being able to sufficiently "read and write"; and the findings of Amtrak's Internal Dispute Resolution Office which stated that Lawrence was "not very credible" in his denial that he had questioned Johnson's (who is apparently an African American) ability to lead and further found that Lawrence did feel uncomfortable around Johnson, although they also found that Lawrence's motivation was unclear. None of these comments directly implicate a racial motivation.

Plaintiffs spend a great amount of energy arguing that the Amtrak's internal review report supports their claim that Lawrence was "uncomfortable" around African Americans and that he lied to the investigator by "making false and pretextual denials." (Pls.' L.R. 56.1(b)(2) Mem. at 9.) As stated previously, Plaintiffs mischaracterize the finding of the report. The report noted that Lawrence was "not very credible" in his denial that he had questioned Johnson's ability to lead and further found that Lawrence felt uncomfortable around Johnson, although the report did not attribute this uncomfortableness to any racial animus. No finding of discrimination was made. (Pls.' L.R. 56.1(a) Stmt. Ex. E-2, ¶ 3.)

15

The "handful and a load" comment is certainly not complimentary, but nor is it a natural inference to say it is a racial comment. Likewise, Lawrence's comment that the Chicago employees could not "read and write" is equally mean-spirited, but is not necessarily racial. Plaintiffs claim that they would be entitled to argue an inference that Lawrence was directing this comment to the African American employees of the center who made up 50% of the workforce in Chicago. The opposite inference could equally be made that Lawrence's comment was directed to the remaining 50% non-African American employees. An inference could also be urged that Lawrence did not appreciate Chicago's residents and the remark was instead a commentary on our educational system. Nonetheless, this Court will credit Plaintiffs' inference on this comment by Lawrence. However, there is no evidence in the record as to when this remark was made, only that it was made around the time of Lawrence's retirement (which is also not stated in the record).[11]

Even if Plaintiffs' inferences regarding the Lawrence comments are accepted and a jury could infer Lawrence's intent in making the comments and if they found them to be racially motivated comments that would not end the inquiry. A jury would still then need to infer how Lawrence actually applied his racial animus into the decision making process. Statements of a discriminatory nature are evidence of discrimination only if they are made around the time of and in reference to the alleged adverse employment action. *See Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th

---

[11] Further, the Lawrence comments are more appropriately labeled "stray" comments which, even if derogatory, fail to show discrimination because the plaintiffs have not establish how they are related to the employment decision at issue in this case. *Olson v. N. FS, Inc.*, 387 F.3d 632, 635 (7th Cir.2004) (noting that a stray remark made months ahead of an employment decision does not constitute direct evidence of discriminatory animus); *Davis*, 368 F.3d at 783 (noting a stray remark made nine months prior is insufficient nexus to adverse action); *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 576 (7th Cir.2003) ("Because of the temporal distance between the comments and the termination decision, as well as the lack of any connection to that decision, the district court properly viewed them as 'stray' workplace remarks, rather than evidence of the thought process behind Schuster's termination.").

Cir. 2001) (citations omitted). Discriminatory remarks are actionable only if they injure the plaintiff; "there must be a real link between the bigotry and an adverse employment action." *Gorence*, 242 F.3d at 762.

There is no evidence in the record which links these comments with the Amtrak Board of Directors' decision to close the Chicago call center. Even though it is undisputed that Lawrence was aware of the discrimination complaints, Lawrence's awareness does not contradict the undisputed fact that he as a member of a four-person team and the team did not consider this information as part of their consideration. Put another way, the undisputed fact is that the four-person team did not consider the racial composition of the call centers or the complaints of discrimination against Lawrence in arriving at any decision.[12] (Def.'s L.R. 56.1(b)(3)(B) Stmt. ¶ 31.) Neither did the Amtrak CEO or the Amtrak Board of Directors. (*Id.* ¶ 38.) Even if Lawrence did make the comments and displayed "uncomfortableness" towards African Americans, Plaintiffs still must show that Lawrence's racial attitude infected the decision made by the four-person team, Amtrak's CEO and Amtrak's Board of Directors. But, this is not possible because Plaintiffs have conceded, as an undisputed fact, that the racial compositions of the call centers and any discrimination claims were not considered by the

---

[12] Plaintiffs argue that Lawrence's role in the evaluation and recommendation process was far greater. They contend that his recommendation for closure was a necessary step before closure could occur. (Pls.' L.R. 56.1(b)(3)(B) Stmt. ¶ 10.) In support of this, plaintiff Anderson submitted an affidavit asserting that Lawrence "must have recommended closure" and "must have had input into the decision" and that the decision to close Chicago "would not have been made but for that input." (Anderson Decl., Ex. A at 3-4, 6-7). However, Anderson's belief as to the extent of Lawrence's role in the decision making process is speculative - what she had experienced in the past with decisions made on a local level does not establish a basis for knowledge as to the method of decision-making on a reduction in force of this nature. Because her affidavit on this issue is speculative, the Court will not give it any weight on this particular point. *See Adusumilli v. City of Chi.*, 164 F.3d 353, 359-60 (7th Cir. 1998) (affirming striking, as speculation, a portion of employee's affidavit attesting to supervisors' alleged knowledge because it was not reasonable to impute knowledge to them). Further, Lawrence was not the final decision-maker as that role was carried out by the Amtrak Board of Directors. *See Venturelli v. ARC Cmty. Servs. Inc.*, 350 F.3d 592, 600 (7th Cir. 2003), *cert. denied*, 541 U.S. 1030 (2004) ("A decisionmaker is the person responsible for the contested decision.")

decision-makers. This concession is devastating to Plaintiffs' claims. Thus, even accepting the remaining inferences suggested by Plaintiffs that there was a long-standing plan to close the call center by Richardson, Hardison, and especially Lawrence,[13] the inferences do not defeat the undisputed fact that the decision-makers up to and including the Amtrak Board of Directors did not consider race or discrimination complaints in arriving at their decision.[14]

Plaintiffs have to show that there exists a "convincing mosaic" that establishes a triable issue of fact for discriminatory intent. Their mosaic consists of their argument that Lawrence engineered a long-term plan to close down the Chicago center because he did not like African Americans. According to Plaintiffs, Lawrence laid in wait for years while displaying his racial attitude against African Americans. But, as they assert, he was stymied in his plan because the union entered into a MOU with Amtrak that limited the basis for a closure of the Chicago call center. However, once Amtrak's business suffered Lawrence made use of this opportunity by being selected to the four-

---

[13] This evidence comprises primarily of the McKinsey Report stipulation and the testimony of Lara that Lawrence remarked in 1998 that the center would be closed in five years.

[14] Similarly, Plaintiffs' reliance on the lack of evidence of Amtrak's compliance with the *McLaurin v. Amtrak* consent decree is equally unavailing. Plaintiffs argue that Amtrak failed to follow their obligation under the *McLaurin v. Amtrak* consent decree to perform a disparate impact analysis on African American management in any reduction in force and they state this failure is evidence of intent to discriminate. (Pls.' L.R. 56.1(b)(2) Mem. at 6.) Amtrak objects to this "fact" as unsupported by the record. There is no dispute that a consent decree existed, and the consent decree required Amtrak to perform a disparate impact analysis for any reduction in force that occurred during the pendency of the consent decree. (Pls.' L.R. 56.1(b)(3)(B) Stmt. ¶¶ 27-28, Ex. H.) What is disputed is whether, as Plaintiffs assert, there was no disparate impact analysis performed. In support, Plaintiffs attach an affidavit from counsel describing the discovery requests made to Amtrak which would have lead to the production of any such analysis and indicating the absence of such a production. (*Id.*) Amtrak counters that Plaintiff voluntarily withdrew its demand for such a document in the course of discovery. The Court is unable to resolve this dispute based on the current record. Where facts are contested, the Court must accept the factual assertions of the non-moving party. *Pardo v. Hosier*, 946 F.2d 1278, 1280 (7th Cir. 1991). Although a lack of an impact report may constitute evidence of discrimination, the plaintiffs offer no evidence to suggest that the closure of the Chicago call center resulted in a disparate impact on African American managers other than pointing to the lack of an impact report. Amtrak's lack of a disparate impact report may actually mean little. Because all of the managers in the Chicago call center were dismissed, the impact fell upon all managers both African American and White alike.

18

person team to evaluate a business plan for the call centers. Although he was aware of the claims of discrimination, Plaintiffs failed to deny the fact offered by Amtrak that none of the team members actually considered race or discrimination complaints. Undaunted, Plaintiffs still urge this Court to find that inference upon inference suggests that there was a plan to close the center that was years in the making and included various executives at Amtrak lying to the CEO and Amtrak Board Chairperson about this plan to close. This is a complicated theory premised upon inference and suggestion. The Seventh Circuit "has typically been skeptical of such elaborate plot theories." *Konowitz v. Schnadig Corp.*, 965 F.2d 230, 234 (7th Cir. 1992). Plaintiffs' elaborate plan theory, in light of their concession that the decision-makers did not consider race, is based on less than a scintilla of evidence and results in a mosaic that is far from convincing.

### B.     Indirect Evidence Method

It bears repeating that Plaintiffs have failed to set forth any legal theories that would apply to their case. Nonetheless, their claims under Title VII and Section 1981 can also proceed under the indirect evidence theory, proven by the burden-shifting method first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiffs must make a prima facie case of racial discrimination by proving that: (1) they are a member of a protected class; (2) they were performing their job satisfactorily; (3) they suffered an adverse employment action; and (4) a similarly situated employee not in the protected class was treated more favorably. *Id.* at 802. *See also Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002) (citing *McDonnell Douglas,* 411 U.S. at 802). If they succeed in making out a prima facie case, Amtrak must articulate a legitimate, non-discriminatory explanation for the adverse employment action. *Contreras v. Suncast Corp.*, 237 F.3d 756, 760 (7th Cir. 2001) *cert denied*, 534 U.S. 824 (2002). If Amtrak can do this, then they

19

would be entitled to summary judgment unless Plaintiffs can rebut this explanation with evidence that the explanation is pretextual. *Id.* However, at all times the ultimate burden of persuasion rests with Plaintiffs. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004).

Plaintiffs appear to agree with the application of this test to their case, however, their argument under the indirect burden-shifting method of *McDonnell-Douglas* is underwhelming. They do not cite to any cases on a legal framework, nor do they even set out the elements of a prima facie case. Further, Plaintiffs devote only two paragraphs of their 15 page memorandum in opposition to summary judgment to demonstrating how they meet their burden under *McDonnell-Douglas*. And, in two sentences, they argue that they can meet the "similarly situated" requirement and point to the other two call centers as the relevant comparable groups. Such short-shrift on a substantial issue may constitute waiver of their claim under this theory. *See Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) ("[The Seventh Circuit has] repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).") (quoting *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir.2004)). Even on this sparse opposition, the Court will still undertake a review of the issue.

### 1. *Similarly Situated Employees.*

Amtrak acknowledges the presence of the first three *prima facie* elements, but argues that the undisputed evidence establishes that Plaintiffs cannot show that they were treated less favorably than other similarly situated employees outside the protected class. Because unlawful discrimination can occur in a variety of employment contexts, courts "have adapted the requirements for making a *prima facie* case in special cases to reflect the reality of the workplace." *Michas v. Health Cost Controls of*

*Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000). Therefore, the fourth element of the *McDonnell-Douglas* test has been altered depending on the facts of the case.

In the traditional reduction in force ("RIF") case, an employer permanently eliminates a position from the workplace, and the work that was done by the discharged employees are no longer being performed. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000) ("The prototypical RIF involves a company that perhaps once employed 100 engineers, but because of a business slow down or change in product lines, now needs only twenty engineers. The rest of the positions are eliminated, not absorbed."). It is Plaintiffs' burden to identify an employee, then demonstrate that they are similarly situated to that employee. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331 n.12 (7th Cir. 2002) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir.2002)). Plaintiffs also must show that there were no distinguishing circumstances that exist between the comparable employees that would legitimately cause an employer to treat them differently. *Ineichen v. Ameritech*, 410 F.3d 956, 960-61 (7th Cir.2005) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).

In the scanty two paragraphs Plaintiffs devote to the *McDonnell-Douglas* test, they only offer two sentences to the fourth prong. They argue that the comparable workforces are the employees of the Riverside and Philadelphia call centers because "all those employees hav[e] the same jobs, fill[] the same functions, and being ultimately supported by the same supervisor – Jay Lawrence, the Senior Director for Call Center Operations." (Pls.' L.R. 56.1(b)(2) Mem. at 14.) Amtrak argues that Philadelphia and Riverside are not "similarly situated" because they are located in different geographic areas, report to different direct supervisors, and have different operating costs associated with the various locations. (Defs.' L.R. 56.1(a)(2) Mem. at 10.)

21

Plaintiffs comprise of African American, White and Latino former employees of the Chicago call center. Obviously, because the entire workforce of the Chicago call center was eliminated, plaintiffs cannot assert "similarly situated" comparable workers in Chicago. African Americans, Whites and Latinos in the Chicago call center were all equally and adversely affected by the reduction. In Chicago there was no discrimination -- all the employees suffered. Instead, plaintiffs argue that the "similarly situated" comparables are the workforces of the Philadelphia and Riverside call centers. This is an interesting argument, which they fail to support with any reference to legal authority. And, the only evidence they rely upon is the statistical data that shows that Riverside employed 230 African Americans and 409 White employees, while Philadelphia employed 198 African Americans and 340 Whites. (Def.'s L.R. 56.1(a) Stmt. ¶ 15.)

Even if this court were to find that the call center workforces of Philadelphia and Riverside are sufficiently similar for comparison purposes (based on a broad analysis that the three centers were all potentially subject to downsizing and Lawrence was the overall national supervisor) there remains a complication: If the employees of the Riverside and Philadelphia centers are the "similarly situated" group, does the evidence support Plaintiffs' argument that the non-African American employees in Riverside and Philadelphia were treated more favorably? Both the African American and the non-African American employees of the Riverside and Philadelphia call centers were treated better that the Chicago employees since they did not suffer a reduction. While it is true that Whites in Riverside and Philadelphia make up more than a majority of the workforce, it is also true that a significant number of African Americans worked in both locations. The fact that 230 African Americans in Riverside and 198 African Americans in Philadelphia did not lose their jobs diminishes Plaintiffs' argument that non-African Americans were treated more favorably. Nonetheless, even assuming that

22

Plaintiffs' reliance on the two other call centers are adequate "comparables" for a similarly situated analysis, the inquiry does not end since Plaintiffs must also get past the "pretextual" hurdle.

## 2. *Legitimate, Nondiscriminatory Reasons – Pretext.*

If Plaintiffs could meet their prima facie burden under Title VII, they would still face the obstacle of Amtrak's assertion of "a legitimate, non-discriminatory reason for its employment action." *See Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). Amtrak has put forth non-discriminatory reasons for shutting down the Chicago call center. The closure was brought about by a reduction in calls made to the call service centers nationally. (Def.'s L.R. 56.1(a) Stmt. ¶¶ 23, 25, 27.) *See Paluck*, 221 F.3d at 1012 (pointing out that a RIF is a legitimate reason for terminating employees). Furthermore, Plaintiffs agree that there was decreased call volume for the national call centers in fiscal year 2002, see Def.'s L.R. 56.1(a) Stmt. ¶ 23), which resulted in a reduced national call center workforce by 122 positions in July 2002. *See id.* ¶ 25.) And, Plaintiffs agree that Amtrak's analyses projected that in fiscal year 2003 there would be 21% more call center capacity than needed for peak periods. (*Id.* ¶ 27.)

Because Amtrak has established legitimate, non-discriminatory reasons for the closure, Plaintiffs need to establish "that the specific reasons given for including [them] in the reduction were pretextual." *See Paluck*, 221 F.3d at 1013. To prove pretext, Plaintiffs must show that Amtrak's explanation of the reduction had no basis in fact, the explanation was not the "real" reason, or the reason given was insufficient to support the action. *See Holmes v. Potter*, 384 F.3d 356, 361 (7th Cir. 2004). Furthermore, Plaintiffs "'must *specifically* refute the facts which allegedly support the employer's proffered reasons.'" *Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 845 (7th Cir.1996) (quoting *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995) (emphasis in original).

Ultimately, the question Plaintiffs must address is "whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

To demonstrate pretext Plaintiffs "must produce 'significantly probative admissible evidence' from which the trier of fact could infer that the employer's reason was false *and* that the actual reason was discriminatory." *Jones v. Union Pacific R.R. Co.*, 302 F.3d 735, 742-43 (7th Cir. 2002) (quoting *King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999)) (emphasis in original). Plaintiffs devote one paragraph to pretext and merely state that Amtrak's reasons are "silly" and *post-hoc* rationalizations. (Pls.' L.R. 56.1(b)(2) Mem. at 14-15.) This is far from the "significantly probative" evidence required. There is no significantly probative evidence to suggest that Amtrak's stated reasons for the closure were pretextual. The undisputed facts establish that the reasons stated by Hardison for the closure actually existed. (Def.'s LR 56.1(a) Stmt. ¶ 32; Hardison Aff. ¶ 15.) Thus, Plaintiffs fail to present evidence that would allow a reasonable trier of fact to infer that Amtrak's stated reasons were lies. *See Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997) ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.").

In the absence of legitimate evidence, this Court cannot say that a downturn in business, especially one that is conceded by the Plaintiffs, was silly. Regardless of whether there was a long-standing plan to close the Chicago call center, there is nothing to suggest dishonesty in Amtrak's belief that business reasons, not racial reasons, necessitated the decision. This Court will "not sit as a super-personnel department with authority to review an employer's business decision." *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005). And, even if Plaintiffs could establish a

prima facie case, they would still not prevail. It certainly was tragic that many people lost their jobs at the Chicago call center. However, Amtrak presented a non-discriminatory reason for closing down the Chicago call center and Plaintiffs failed to show pretext. Accordingly, the Court grants summary judgment on the Title VII racial discrimination claims and the Section 1981 claims.

## II.  Plaintiffs' Retaliation Claim.

Because Plaintiffs' entire opposition to summary judgment does little to clarify the legal basis for their claims, this Court has stretched their legal arguments under Title VII for their racial discrimination claims and for their Section 1981 claims as much as possible without finding a waiver of the claims. However, for their claim of retaliation, it is not possible to build upon a thin reed, because there is no reed (thin or otherwise) to build upon. Plaintiffs failed to address this claim in any meaningful way. As such, this Court has no choice but to find that they have waived this claim. *See Weinstein* 422 F.3d at 477 n.1 ("[The Seventh Circuit has] repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).") (quoting *Kramer*, 355 F.3d at 964 n.1). Based on this waiver, summary judgment for Defendant will be granted on Plaintiffs' Title VII claims of retaliation.

## Conclusion

For the reasons provided above, the Court grants Defendant's motion for summary judgment on all remaining Counts. The Court further finds that Plaintiffs' Motions in Limine [doc. nos. 96-98; 100; 103; and 105] are hereby denied as moot. The Court also finds that Defendant's Motions in Limine [doc. nos. 99; 101-102; 104; and 106-108] are also denied as moot. The Court directs the Clerk of the Court to enter judgment accordingly.

**SO ORDERED:**

Date: APR 0 6 2006

Hon. Maria Valdez
United States Magistrate Judge

26